CHARLES E. CANTER (Cal. Bar No. 263197)
Email: canterc@sec.gov
SARA D. KALIN (Cal. Bar No. 212156)
Email: kalins@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission

Joseph G. Sansone, Chief (Market Abuse Unit)
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616

Douglas M. Miller, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JORDAN QSAR, GRANT WITHERSPOON, AUSTIN BERNARD, and CHASE LAMBERT,<br><br>Defendants. | Case No. '24CV0570 AJB  BLM<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY

1. This case involves insider trading by Defendants Jordan Qsar ("Qsar"), Grant Witherspoon ("Witherspoon"), Austin Bernard ("Bernard"), and Chase Lambert ("Lambert") (collectively, "Defendants") in the securities of Del Taco Restaurants, Inc. ("Del Taco"). Qsar, a minor league baseball player, returned to his home in the San Diego area in October 2021 during a break from baseball. While in

San Diego, he socialized with a close friend who worked as a finance employee (the "Finance Employee") for Jack in the Box Inc. ("Jack in the Box"). In the fall of 2021, the Finance Employee was working on Jack in the Box's acquisition of Del Taco (the "Acquisition") and shared this material nonpublic information with Qsar in confidence and under the understanding that Qsar would not trade on the information or disclose it to others.

2.  Instead, Qsar misappropriated the confidential information from the Finance Employee, purchasing call options for Del Taco stock ("TACO call options") between mid-October and late November 2021.

3.  Qsar also tipped Defendants Bernard, Witherspoon, and Lambert, and all three of them purchased TACO call options, largely the same series of TACO call options Qsar bought.

4.  Qsar disclosed this information to his co-Defendants in breach of his duty of trust and confidence for personal benefit, expecting them to trade. Bernard, Witherspoon, and Lambert each were aware that the information had been divulged in breach of a duty of trust and confidence for personal benefit. And each Defendant traded on the basis of this material nonpublic information.

5.  As a result of Jack in the Box's announcement of the Acquisition in December 2021, Del Taco's stock price rose by 66%. Qsar, Bernard, Witherspoon, and Lambert sold their options and made about $189,000 in combined trading profits.

6.  By engaging in the conduct alleged in this complaint, Defendants violated the antifraud provisions of the federal securities laws, specifically, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240.10b-5. The SEC seeks permanent injunctions, disgorgement of all ill-gotten gains, and civil penalties.

**JURISDICTION AND VENUE**

7.  The Court has jurisdiction over this action pursuant to Sections 21(d)(1),

2

21(d)(3)(A), 21A and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u-1 & 78aa.

8. The SEC brings this action under Section 21(d) and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u-1. Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

9. Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Qsar and Bernard reside in this district.

## THE DEFENDANTS

10. **Jordan Qsar**, age 28, resides in El Cajon, California. Qsar played baseball for Pepperdine University ("Pepperdine"), then for minor league teams affiliated with the Tampa Bay Rays ("Rays") and other organizations.

11. **Austin Bernard**, age 27, resides in Oceanside, California. Bernard played baseball at Pepperdine with Qsar, and then for minor league teams. He recently signed to play with a baseball team in India.

12. **Grant Witherspoon**, age 27, resides in Littleton, Colorado. Witherspoon played baseball with Qsar on a minor league team affiliated with the Rays. He now plays baseball in Mexico.

13. **Chase Lambert**, age 27, resides in Malibu, California. Lambert played baseball at Pepperdine with Qsar, and then for minor league teams. He currently works as an electrician and baseball coach.

## RELEVANT ENTITIES AND INDIVIDUALS

14. **Del Taco Restaurants, Inc.**, was a Delaware company headquartered in Lake Forest, California, until March 8, 2022, after which it was acquired by a subsidiary of Jack in the Box. Del Taco was an SEC-reporting company quoted on

3

1  the NASDAQ Stock Market under the symbol "TACO," and had shares registered
2  pursuant to Section 12(b) of the Exchange Act.

3      15.    **Jack in the Box Inc.**, is a Delaware company headquartered in San
4  Diego, California.  Jack in the Box operates and franchises quick serve restaurants
5  and is one of the nation's largest hamburger chains.  It is an SEC-reporting company
6  quoted on the NASDAQ Global Select Market under the symbol "JACK," and has
7  shares registered pursuant to Section 12(b) of the Exchange Act.

8      16.    **Finance Employee** was, at all relevant times, employed by Jack in the
9  Box to work on finance-related matters.  The Finance Employee had knowledge of
10 the Acquisition and was responsible for, among other things, tasks related to the
11 Acquisition due diligence process.

## COMMONLY-USED TRADING TERMS

13     17.    A stock option, commonly referred to as an "option," gives its
14 purchaser-holder the right, but not the obligation, to buy or sell shares of an
15 underlying stock at a specified price per share (the "strike price") within a specific
16 period of time prior to the expiration date ("expiration").  Options are generally sold
17 in "contracts," which give the option holder the opportunity to buy or sell 100 shares
18 of an underlying stock.

19     18.    A "call" option gives the purchaser-holder of the option the right to
20 purchase a security at a specified strike price prior to expiration.  A call option is "out
21 of the money" when the strike price is above the current market price of the
22 underlying security and "in the money" when the strike price is below the market
23 price. Generally, the buyer of an out-of-the-money call option anticipates that the
24 market price of the underlying security will increase so that the option will be in the
25 money before the option expires, thus providing a profit to the holder of the option.

26     19.    Options are often listed in "series," which consist of the options on a
27 given security with the same strike price and same expiration date.

# THE ALLEGATIONS

## A. Background

### 1. Relationships Among the Defendants

20. In the mid-2010s, Qsar, Bernard, Lambert, and the Finance Employee attended Pepperdine and played on the school's baseball team together.

21. After graduating, they moved away to play baseball for different minor league teams or pursue other career opportunities but remained close friends.

22. The Finance Employee was closest with Qsar.

23. The Finance Employee and Qsar shared confidences, including about their romantic relationships and their personal financial information.

24. The Finance Employee trusted Qsar to maintain those confidences, and Qsar knew that the Finance Employee expected him to maintain those confidences and not to misappropriate information shared with Qsar for his own benefit.

25. During 2021, Qsar, Bernard, Lambert, and the Finance Employee would sometimes socialize in the San Diego area if they were all in Southern California at the same time.

26. Qsar and Witherspoon were both drafted by the Rays in 2018 and played on various minor league teams affiliated with the organization.

27. During fall 2021, Qsar and Witherspoon played for the same minor league baseball team and were close friends and roommates.

### 2. Finance Employee's Involvement in the Transaction

28. The Finance Employee began working for Jack in the Box as a Senior Associate, Strategic Finance, in August 2021.

29. He became aware of the Acquisition in mid-September 2021, and was part of the deal team. The Finance Employee's responsibilities included coordinating the due diligence effort and conducting financial analysis.

30. The Finance Employee was privy to information such as Acquisition timing and draft merger agreements.

5

31. The information the Finance Employee had about the Acquisition was material nonpublic information.

32. In connection with his employment, the Finance Employee signed a confidentiality agreement and understood that information he received related to the Acquisition was confidential.

**B.   DEFENDANTS' INSIDER TRADING SCHEME**

**1.   Qsar Misappropriates Material Nonpublic Information Shared in Confidence by the Finance Employee**

33. During summer 2021, Qsar was on the road playing baseball. He returned to San Diego on or about October 2, 2021, and he, the Finance Employee, and several other friends—including Bernard and Lambert—went out together drinking.

34. Qsar learned about the Acquisition from the Finance Employee on or about October 2, 2021.

35. While Qsar was still in San Diego, he told Witherspoon about the Acquisition.

36. Around the same time, Qsar also told another Rays teammate, Individual 1, about the Acquisition.

37. Qsar, Witherspoon, and Individual 1 were all in different parts of the country at the time, and they began exchanging text messages about investing in Del Taco.

38. In their initial texts, Qsar, Witherspoon, and Individual 1 demonstrated that they knew they had obtained material nonpublic information by attempting to concoct an alternative explanation for their eventual trades.

39. For example, on or about October 5, 2021, Witherspoon texted Qsar and Individual 1, "[c]heck out this stock guys Del taco, this chart is looking bullish to me. Might try to gamble on some options or something, I love to eat at del taco."

40. At the time of the text message, Del Taco stock was trading at about $8.74 per share.

41. Qsar responded, "I'm thinking about it too[.] Chart looks primed to boom[.] What's it [sic] 52 week high?"

42. Witherspoon responded, "$11.99[.] Could see it hitting $10 easy[.]"

43. Qsar responded, "If we break 10 new 52 week highs could follow[.] The payout could be ridiculous if we buy the January 2022 calls[.]"

44. By "January 2022 calls," Qsar was referring to TACO call options with a strike price of $10 expiring in January 2022.

45. At the time, Qsar did not know the precise timing of the Acquisition, but he expected it to occur before the end of the year and he knew that call options would provide the opportunity to make the most profit.

46. About a week later, Qsar, Witherspoon, and Individual 1 all attended a baseball training camp in Florida together.

### 2. Qsar and Witherspoon Start Trading on the Misappropriated Material Non-Public Information

47. On October 15, 2021, while in a locker room at the training camp with Individual 1, Qsar and Witherspoon each bought TACO call options with a strike price of $10 expiring on January 21, 2022—Qsar bought 15 options for $465 and Witherspoon bought 113 options for $3,683.

48. At the same time, Individual 1 also bought the same series of TACO call options.

49. Qsar purchased two more of the same TACO call options on October 20, 2021.

50. Witherspoon purchased one of the same TACO call options on October 18, 2021, and 12 more of the same options on October 20, 2021.

7

### 3. Qsar Misappropriates More Material Nonpublic Information Shared in Confidence by the Finance Employee

51. On Thursday, October 21, 2021, while texting about Del Taco, Qsar sent a text message to Witherspoon and Individual 1 saying, "I'm going to la tomorrow with my buddy and he has a call during are [sic] drive 😈." The "buddy" Qsar was referring to was the Finance Employee.

52. Witherspoon was aware that the Finance Employee worked for Jack in the Box.

53. Witherspoon responded to Qsar's text about the drive with the Finance Employee, "No way," and Qsar replied, "4 hour call 😈 😈 😈."

54. Witherspoon responded, "That's incredible," and Qsar texted back, "Hopefully about the good good [sic]."

55. Later that day, Qsar texted Witherspoon and Individual 1: "I'll have a full report on Saturday for you guys[.]" Witherspoon responded, "Better be good[.]"

56. The next day, Friday, October 22, 2021, the Finance Employee and Qsar drove to Los Angeles. During the drive, the Finance Employee was on a four-hour Zoom call about the Acquisition, which lasted more than the length of the drive.

57. The Finance Employee took parts of the call on speaker phone and answered some of Qsar's questions about the Acquisition, including providing Qsar with material nonpublic information about the Acquisition.

58. The Finance Employee expected that Qsar would keep this additional information confidential, and Qsar was aware that the Finance Employee expected him to maintain its confidentiality.

59. Nevertheless, in breach of his duty of trust and confidence to the Finance Employee, Qsar divulged the additional information shared with him during the drive to Witherspoon and Individual 1, expecting that this information would be used in securities trading.

### 4. Qsar and Witherspoon Continue Trading on the Misappropriated Material Non-Public Information

60. After the October 22, 2021 drive with the Finance Employee, Qsar bought additional securities on the basis of the material nonpublic information about the Acquisition and encouraged others to do so.

61. Between October 23, 2021, and November 30, 2021, Qsar bought 176 TACO call options for $2,119.

62. All told, between October 15, 2021, and November 30, 2021, Qsar bought 258 out-of-the-money TACO call options with a strike price of $10. Most of those options, 136 of them, expired on January 21, 2022. The remaining 122 options expired on December 17, 2021.

63. Qsar spent a total of $4,099, not including fees and commissions, to buy the TACO call options.

64. Qsar bought the TACO call options on the basis of material nonpublic information he learned from the Finance Employee about the Acquisition.

65. On or about October 23, 2021, Individual 1 texted Qsar saying, "every dollar I earn hustling is going to taco[.]" Individual 1 then suggested he might "take everything out of saving [sic] and go all in[.]" Qsar responded, "Yeah and catch a case haha[.]"

66. Witherspoon also bought more TACO call options after Qsar's ride to Los Angeles with the Finance Employee. On November 2, 2021, Witherspoon bought 58 TACO call options with a strike price of $10 and expiration date of January 21, 2022, the same series of options he had bought in the locker room with Qsar on October 15, 2021.

67. Witherspoon sold and rebought more TACO call options between November 3, 2021, and November 30, 2021. By November 30, 2021, Witherspoon was holding 204 out-of-the-money TACO call options with a strike price of $10, 182 of which expired on January 21, 2022, and the remaining 22 options expired on

December 17, 2021, the same two series Qsar had bought. Witherspoon paid a total of $5,157 for the options, not including fees and commissions.

**5.  Witherspoon bought the TACO call options on the basis of the material nonpublic information he learned from Qsar about the Acquisition.  Qsar Tipped Bernard and Together They Tipped Lambert**

68. Qsar and Bernard work out together in the off season.

69. In October 2021, around the same time Qsar learned about the Acquisition and began texting about Del Taco with Witherspoon, Qsar tipped Bernard about the Acquisition.

70. Bernard discussed with Qsar which options to buy to profit from the information that Qsar had obtained about the Acquisition.

71. Before the Acquisition was announced, Qsar also told Bernard that the information about the Acquisition came from the Finance Employee.

72. At first, Bernard lacked funds to make a large investment in TACO call options.  On October 20, 2021, Bernard spent $70 to buy seven TACO call options with a strike price of $12.50, five expiring in January 2022 and two expiring in March 2022.  He bought another 50 options of the $12.50 January 2022 series on November 4, 2021.

73. By mid-November, however, Bernard had acquired more funds and he began purchasing more TACO call options. Between November 18, 2021, and December 2, 2021, Bernard bought 313 TACO call options, all but 40 of which were the same two series Qsar had bought.

74. By December 3, 2021, Bernard was holding 370 out-of-the-money TACO call options for which he had paid a total of $3,720.

75. Bernard bought the TACO call options on the basis of the material nonpublic information he learned from Qsar about the Acquisition.

76. After Qsar tipped Bernard, he and Bernard had an in-person conversation with Lambert in San Diego. Qsar and Bernard communicated material nonpublic information to Lambert about the Acquisition and recommended that Lambert buy TACO call options.

77. Lambert knew that the Finance Employee worked for Jack in the Box.

78. Like Bernard, Lambert also lacked funds to buy TACO call options when he first learned of the Acquisition.

79. On December 1, 2021, Lambert bought 114 TACO call options for $1,710. All these options had a strike price of $10 and an expiration date of January 21, 2022, the same options series the other Defendants had purchased.

80. Lambert bought the TACO call options on the basis of the material nonpublic information he learned from Qsar and Bernard about the Acquisition.

**C.     Other Communication of Material Nonpublic Information about the Acquisition by the Defendants**

81. In addition to tipping Witherspoon, Bernard, Lambert, and Individual 1, Qsar also tipped his father about the Acquisition.

82. Qsar's father, with Qsar's assistance, bought TACO call options.

83. Witherspoon communicated material nonpublic information about the Acquisition to his high school friend, Individual 2.

84. Individual 2 bought TACO call options.

85. In addition to his communications with Lambert, Bernard communicated material nonpublic information about the Acquisition to his brother and another former baseball player from Pepperdine, Individual 3, both of whom bought TACO call options.

86. Lambert also communicated material nonpublic information about the Acquisition to his cousin.

87. Lambert's cousin bought TACO call options.

**D.     The Announcement of the Acquisition and Defendants' Illegal Profits**

88.     Between October 15 and December 3, 2021, TACO's stock price never closed above $8.67.

89.     On Monday, December 6, 2021, Jack in the Box and Del Taco announced that Jack in the Box was acquiring Del Taco through a stock purchase transaction valued at about $575 million or $12.51 per share.

90.     Following the announcement of the Acquisition, Del Taco's stock price rose by 66% to $12.40, and the Defendants sold their TACO call options.

91.     Qsar made about $56,500 in trading profits.

92.     Witherspoon made about $42,800 in trading profits.

93.     Bernard made about $64,700 in trading profits.

94.     Lambert made about $25,100 in trading profits.

95.     Qsar received a personal benefit from tipping, including the benefit of providing a gift of confidential information to his close personal friends and a family member, including the other Defendants, his friends, teammates, former teammates, and his father.

**E.     Defendants' Knowledge**

96.     Each Defendant acted with scienter; each had intent to deceive or defraud.

97.     The tipper, Qsar, defrauded and betrayed the confidence of the Finance Employee by trading for his own account and repeatedly tipping his close friends and his father for personal benefit.

98.     The tippee Defendants (Witherspoon, Bernard, and Lambert) traded on this information and communicated it to others, despite their awareness that the material nonpublic information about the Acquisition that they received from Qsar was from an unlawful source.

99.     All the Defendants traded in TACO call options, many of the same series.

Qsar

100. Qsar acted with scienter in misappropriating the material nonpublic information he learned about the Acquisition from the Finance Employee and trading on it and tipping others.

101. Qsar owed a duty of trust and confidence to the Finance Employee. The Finance Employee communicated material nonpublic information about the Acquisition to Qsar as part of their history, pattern, and practice of sharing confidences, expected Qsar to maintain its confidentiality by not disclosing it to others or trading on it, and Qsar knew or was reckless in not knowing that the Finance Employee expected Qsar to maintain its confidentiality by not disclosing it to others or trading on it.

102. Qsar admitted that he never told the Finance Employee about his trading because Qsar knew his conduct was wrong and regretted having betrayed his friend's trust and confidence.

103. Qsar knew or was reckless in not knowing that the information was material and nonpublic. He used the information to purchase securities, and this information was a significant factor in his decision to purchase securities. And Qsar communicated material nonpublic information about the Acquisition to Witherspoon, Bernard, Lambert, Individual 1, and his father knowing, consciously avoiding knowing, or being reckless in not knowing that the information Qsar communicated would be used to trade securities.

Witherspoon

104. Witherspoon knew, consciously avoided knowing, or was reckless in not knowing that the material nonpublic information about the Acquisition had been divulged to him in a breach of a duty of trust and confidence for personal benefit. As Qsar's direct tippee, Witherspoon of course knew that he and Qsar were close friends.

105. Witherspoon also knew, when Qsar was driving to Los Angeles with the Finance Employee on October 22, 2021, that Qsar was surreptitiously attempting to

obtain more information about the Acquisition from the Finance Employee as evidenced by the text messages described in paragraphs 39-43.

106. In text messages, Witherspoon tried to obscure the true reason he was buying Del Taco securities, claiming it was because he liked the food and thought the stock chart looked bullish.

107. Witherspoon knew or was reckless in not knowing that the information was material and nonpublic, he used the material nonpublic information in the purchase of securities, and this information was a substantial factor in his decision to purchase securities. And Witherspoon communicated material nonpublic information about the Acquisition to Individual 2 knowing, consciously avoiding knowing, or being reckless in not knowing that the information Witherspoon disclosed would be used to trade securities.

108. In a conversation between Witherspoon and Qsar on December 13, 2022, Qsar told Witherspoon that the Finance Employee was upset because he had received a list of individuals who had traded Del Taco securities that included Qsar and Witherspoon, and anticipated questions about their trading in Del Taco. In response, Witherspoon raised the possibility of jail time.

Bernard

109. Bernard knew, consciously avoided knowing, or was reckless in not knowing that the material nonpublic information about the Acquisition had been divulged in a breach of a duty of trust and confidence for personal benefit. As Qsar's direct tippee, Bernard of course knew that he and Qsar were close friends. Bernard admitted that he understood his actions were illegal.

110. After communicating material nonpublic information to Individual 3, Bernard and Individual 3 attempted to conceal their conduct, exchanging text messages that included the coded statement, "Need TACOma to come through[.]"

111. Bernard knew or was reckless in not knowing that the information was material and nonpublic, he used the material nonpublic information in the purchase of

securities, and this information was a substantial factor in his decision to purchase securities. And Bernard communicated material nonpublic information about the Acquisition to Lambert, Bernard's brother and Individual 3 knowing, consciously avoiding knowing, or being reckless in not knowing that the information Bernard disclosed would be used to trade securities.

<u>Lambert</u>

112. Lambert knew, consciously avoided knowing, or was reckless in not knowing that the material nonpublic information about the Acquisition had been divulged in a breach of a duty of trust and confidence for personal benefit. As Qsar's direct tippee, Lambert of course knew that he and Qsar were close friends.

113. Lambert admitted that after Del Taco announced the Acquisition and he sold his TACO call options, he "didn't . . . want to be anywhere close to the relationship" with the Finance Employee.

114. Lambert knew or was reckless in not knowing that the information was material and nonpublic, he used the material nonpublic information in the purchase of securities, and this information was a substantial factor in his decision to purchase securities. And Lambert communicated material nonpublic information about the Acquisition to his cousin knowing, consciously avoiding knowing, or being reckless in not knowing that the information Lambert disclosed would be used to trade securities.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against All Defendants)**

115. The SEC realleges and incorporates by reference paragraphs 1 through 114 above.

116. Qsar learned material nonpublic information from the Finance Employee. Qsar knew or was reckless in not knowing, that the information he possessed concerning the Acquisition was material nonpublic information.

117. At all relevant times, Qsar had a relationship of trust and confidence with the Finance Employee that required him to keep nonpublic information regarding the Acquisition confidential. Qsar knew, or was reckless in not knowing, that he owed the Finance Employee a duty of trust or confidence to keep the material nonpublic information he possessed concerning the Acquisition confidential. Qsar, with scienter, breached that duty by using that information to trade TACO securities and by tipping his close friends Witherspoon and Individual 1 (who were also his teammates at the time), Bernard and Lambert (his close friends and former teammates), and his father for the benefit of making a gift to a close friend or relative.

118. Witherspoon, Bernard, and Lambert each knew, consciously avoided knowing, or was reckless in not knowing, that the material nonpublic information about the Acquisition had been divulged in breach of a duty of trust and confidence for personal benefit.

119. Witherspoon, Bernard, and Lambert each used the material nonpublic information about the Acquisition in trading Del Taco securities.

120. Witherspoon, with scienter, communicated material nonpublic information to his high school friend, Individual 2, with the intention that Individual 2 would use the information to trade Del Taco securities and for the personal benefit of making a gift to a close friend.

121. Bernard, with scienter, communicated material nonpublic information to his brother and his former college teammate and close friend, Individual 3, with the intention that his brother and Individual 3 would each use the information to trade Del Taco securities and for the personal benefit of making a gift to a close friend or relative.

122. Lambert, with scienter, communicated material nonpublic information to his cousin with the intention that his cousin would use the information to trade Del Taco securities, and for the personal benefit of making a gift of information to a relative.

123. By engaging in the conduct described above, Defendants Qsar, Witherspoon, Bernard, and Lambert, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

124. By engaging in the conduct described above, Defendants Qsar, Witherspoon, Bernard, and Lambert violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure permanently enjoining Defendants Qsar, Witherspoon, Bernard, and Lambert and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

Order Defendants Qsar, Witherspoon, Bernard, and Lambert to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7), 15 U.S.C. §§ 78u(d)(5), 78u(d)(7).

### IV.

Order Defendants Qsar, Witherspoon, Bernard, and Lambert to pay a civil penalty under Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant such other and further relief as this Court may determine to be just and necessary.

**Jury Demand**

The SEC demands trial by jury on liability.

Dated: March 26, 2024

                                           /s/ Charles E. Canter
                                           Charles E. Canter
                                           Sara D. Kalin
                                           Attorneys for Plaintiff
                                           Securities and Exchange Commission